UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

AMY FOTH,

    Plaintiff,

v.                                      Case No. 20-CV-113

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

---

## DECISION AND ORDER

Amy Foth seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

Foth filed an application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income alleging disability beginning on February 6, 2015 due to fibromyalgia, IBS with GERD, depression, anxiety, sick sinus syndrome, asthma, atrial tachycardia, and cardiac pacemaker. (Tr. 517.) Foth's applications were denied initially and upon reconsideration. (Tr. 148.) Foth filed a request for a hearing and a hearing was held before an Administrative Law Judge ("ALJ") on September 19, 2018. (Tr. 188–234.) Foth testified at the hearing, as did Deena Olah, a vocational expert. (Tr. 188.)

In a written decision issued October 31, 2018, the ALJ found that Foth had the following severe impairments: obesity, asthma, anxiety, depression, sick sinus syndrome status-post cardiac pacemaker, and fibromyalgia. (Tr. 150.) The ALJ further found that Foth did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 151–55.) The ALJ found that Foth had the residual functional capacity ("RFC") to perform a reduced range of sedentary work. (Tr. 155–56.) Specifically, Foth was limited to a job with a sit/stand option, allowing her to shift from either sitting or standing at intervals of approximately 30 minutes, provided that she does not leave the workstation and the shifting of positions results in her being off-task no more than 1–2 minutes with each position shift; a job with no climbing ladders, ropes, or scaffolds; no kneeling, crouching, or crawling; occasionally climbing stairs and ramps; and occasionally balancing and stooping. (*Id.*) Foth was limited to a job with no more than occasional exposure to extreme temperatures, humidity, wetness, and pulmonary irritations and to a job with no exposure to hazards. (*Id.*) Foth was limited to a job that did not require use of a motor vehicle. (*Id.*)

As to her mental impairments, the ALJ limited Foth to a job where she could understand, remember, and carry out simple instructions and tasks and to work that has no strict time or high quota demands. (*Id.*) She was limited to a routine work setting with only occasional changes in the work routine; to simple workplace decisions; to sustained concentration and persistence at simple tasks up to one hour at a time with normal breaks during an 8-hour workday; no interaction with the general public; occasional, brief interaction with co-workers and supervisors; no tandem tasks or working in teams; and allowed to be off-task up to ten percent of the workday in addition to regularly scheduled breaks. (*Id.*)

2

While the ALJ found that Foth was unable to perform any of her past relevant work, the ALJ found that given Foth's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform. (Tr. 160–63.) As such, the ALJ found that Foth was not disabled from her alleged onset date until the date of the decision. (Tr. 163.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Foth's request for review. (Tr. 1–6.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered

by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

  2. *Application to this Case*

Foth argues that the ALJ failed to: (1) properly assess the opinion of her treating physician, Dr. Todd Painton; (2) properly evaluate Foth's subjective symptoms; (3) properly assess Foth's mental impairments; and (4) properly determine the number of jobs available to her in the national economy. I will address each argument in turn.[1]

  2.1 Weight Given to Dr. Painton's Opinion

Foth argues the ALJ erred in the weight assigned to the opinion of her treating physician, Dr. Painton. An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on the source. 20 C.F.R. § 404.1527.[2] Generally, more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2).[3] If the opinion of a treating source is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion is given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, he may not simply reject it. SSR 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he must

---

[1] Foth initially also argued that the Commissioner of the SSA holds his office on a constitutionally illicit basis and thus the ALJ's action were unconstitutional. (Pl.'s Br. at 2, Docket # 15.) Foth subsequently withdrew this argument. (Pl.'s Reply Br. at 13, Docket # 28.) Thus, it will not be addressed further.

[2] As the regulations governing the evaluation of disability for disability insurance benefits and SSI are nearly identical, I will generally refer to the regulations for disability insurance benefits found at 20 C.F.R. § 404.1520, *et seq.* for ease of reference.

[3] On January 18, 2017, the SSA published the final rules entitled "Revisions to Rules Regarding the Evaluation of Medical Evidence" in the Federal Register (82 FR 5844). The final rules became effective on March 27, 2017. For claims filed before March 27, 2017, however, the SSA continues to apply the prior rules that were in effect at the time of the ALJ's decision. https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html (last visited Feb. 12, 2021).

4

evaluate the opinion's weight by considering a variety of factors, including the length, nature, and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(c).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Foth began treating with Dr. Painton, an Internist, in January 2017. (Tr. 1469.) She treated with Dr. Painton in 2017 and 2018. On January 31, 2018, Dr. Painton completed a "Work Restrictions" form, in which he opined that Foth could stand/walk for less than two hours in an eight-hour workday and sit for about two hours in an eight-hour workday. (Tr. 1502.) He opined that Foth could not sustain full-time work, meaning work for eight hours per day, forty hours per week. (*Id.*) Dr. Painton opined that Foth required a job that permits shifting positions at will and that she would require two to three unscheduled breaks per day of one to two hours. (*Id.*) Dr. Painton opined that Foth could occasionally lift less than ten pounds and rarely lift ten pounds. (Tr. 1503.) Dr. Painton further opined that Foth required fine and gross manipulation limitations of both hands and restricted reaching in both hands. (Tr. 1504.)

The ALJ assigned little weight to Dr. Painton's opinion, finding that his statement: (1) consists of only a completed form with no explanation of the limitations; (2) is inconsistent

5

with his own treatment notes (specifically a January 2018 recommendation to do yoga or tai chi); and (3) several examinations showing Foth had normal gait, sensation, and range of motion in all extremities. (Tr. 159.) Foth argues that the ALJ's reasons for rejecting Dr. Painton's opinion are flawed. Specifically, Foth argues that Dr. Painton's opinion was not inconsistent with the treatment records because exercise (such as yoga or tai chi) is a common treatment recommendation for fibromyalgia. Further, Foth argues that her normal musculoskeletal and neurological examinations are common in fibromyalgia patients, and does not provide any insight into her joint and muscle pain. (Pl.'s Br. at 10–11.)

I do not find the ALJ erred in assigning little weight to Dr. Painton's opinion. As the ALJ stated, Dr. Painton's opinion consists of a completed form with no explanation for the assigned limitations. (Tr. 159.) The Seventh Circuit has noted that a "check-box form" is "weak evidence," taking on greater significance only when "it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). But, as the ALJ found, Dr. Painton's opinion is not consistent with his treatment records. Foth established care with Dr. Painton in January 2017. (Tr. 1469.) Dr. Painton acknowledged Foth's previous diagnosis of fibromyalgia and the fact that she has "a good deal of chronic persisting pain"; however, Dr. Painton also noted that Foth manages the pain with Tramadol. (*Id.*) Foth next treated with Dr. Painton in May 2017. (Tr. 1373.) At this time, Dr. Painton noted Foth continued to experience fatigue and generalized pain, but Foth's primary concern at this visit was lightheadedness, believed to be caused by dehydration. (Tr. 1377.)

Foth treated with Dr. Painton again in June 2017, at which time her lightheadedness was again addressed, with the only mention of her fibromyalgia being that she continued to experience fatigue and generalized pain. (Tr. 1373.) Upon physical examination, however,

6

Dr. Painton noted normal motor strength. (*Id.*) In July 2017, Dr. Painton noted that while Foth takes a "fairly high dose[ ]of tramadol for pain relief," it "keeps the pain in a fairly controlled state." (Tr. 1367.)

Foth next treats with Dr. Painton in November 2017. (Tr. 1431.) She reported "no new complaints" and denied having muscle aches, weakness, arthralgias, joint pain, back pain, or swelling in the extremities. (Tr. 1435.) She reported no weakness or numbness. (*Id.*) Foth showed normal motor strength upon physical examination. (Tr. 1436.) Foth treated with Dr. Painton in March 2018 after suffering an acute rib injury. (Tr. 1509–10.) She saw him again in June after experiencing suicidal ideation subsequent to running out of her Paxil medication one month prior. (Tr. 1557.) Her fibromyalgia was not addressed at either the March or June appointments. Later that month, Dr. Painton noted that Foth's fibromyalgia "has been chronically managed with tramadol," and Foth stated that "it is baseline with bit of a flare currently secondary to being alive [sic] music show last night and standing for a good deal of time." (Tr. 1552.) However, her energy level was "fairly good" and she was "trying to have a graded exercise program." (*Id.*) In August 2017, Foth treated with Dr. Painton, reporting a fibromyalgia flare-up, causing leg pain. (Tr. 1539.) However, Foth was also experiencing severe abdominal pain at this time secondary to constipation. (Tr. 1542–43.) Dr. Painton noted that increased fibromyalgia pain "is not too unusual during times of acute illness." (Tr. 1543.)

Given Dr. Painton's treatment notes, it is entirely unclear the supporting basis for his work restrictions. Again, Dr. Painton opined that Foth could stand/walk for less than two hours in an eight-hour workday and sit for about two hours in an eight-hour workday. (Tr. 1502.) While the walking and standing restriction bears out in his records, Foth does not

7

report any difficulties with prolonged sitting. Nor do his records address his proposed lifting restrictions and limitations on fine and gross manipulation in both hands. Dr. Painton's physical examinations show normal strength in Foth's upper and lower extremities. While Foth argues that fibromyalgia patients can experience normal musculoskeletal and neurological examinations and thus "normal gait and sensation" are "insufficient bas[es] upon which the ALJ could have rejected" Dr. Painton's statement (Pl.'s Reply Br. at 4, Docket # 28), I disagree with Foth's broad statement. What "generally" occurs in fibromyalgia patients is of little value to understanding how Foth's fibromyalgia affects her body function. And nothing in Dr. Painton's records support such extreme manipulative limitations.

Foth perhaps recognizes this, arguing that Dr. Painton had access to the treatment records of Foth's treating rheumatologist, Dr. Kent Partain, and the medical records as a whole provide support for Dr. Painton's "check-box" opinion. (Pl.'s Reply Br. at 2–3.) As an initial matter, Foth correctly points out that the ALJ incorrectly stated that Dr. Painton advised Foth to try yoga or tai chi to treat her fibromyalgia. (Pl.'s Br. at 10; Tr. 159.) This recommendation was made by Dr. Partain. (Tr. 1421.) This error, however, is of little import, as Dr. Partain's treatment notes fail to provide support for Dr. Painton's restrictions.

Foth treated with rheumatologist Dr. Partain twice during the relevant time period— in September 2017 and January 2018. (Tr. 1359, 1417.) While Dr. Partain did note that Foth experienced intermittent cramping of the MCP joints when she does activities such as needlepoint or coloring, this does not support Dr. Painton's extreme manipulative limitations. (Tr. 1363.) Dr. Partain, like Dr. Painton, noted that Foth experienced tenderness in multiple areas of her body, including her hips and thighs, as is consistent with fibromyalgia. (Tr. 1363,

8

1420.) Dr. Partain strongly recommended Foth attempt a chronic noninterventional pain program (Tr. 1363–64) as she did not seem to respond well to medications (Tr. 1421). When Foth followed-up with Dr. Partain in January 2018, however, she told him that she did not have time to participate in any non-interventional chronic pain programs given that she was working on her master's degree and writing a book. (Tr. 1420.) Even assuming Dr. Painton relied on Dr. Partain's records in rendering his opinion, it is unclear how he translated these findings into the limitations opined in his statement. For these reasons, I do not find the ALJ erred in assigning little weight to Dr. Painton's statement.

### 2.2 Consideration of Subjective Symptoms

Foth also argues the ALJ erred in consideration of her subjective symptoms. Specifically, she argues that the ALJ improperly relied on her ability to travel and her acceptance into a master's program at Johns Hopkins University in discounting her allegations of disabling pain; failed to assess her limitations "vis-à-vis the record"; failed to consider her IBS symptoms; and failed to generally consider her symptoms of pain and fatigue.

The ALJ discounted Foth's allegations of disabling symptoms partly because she was able to travel to Germany in 2016, was able to travel to Oklahoma, and was able to apply for a master's program at Johns Hopkins University. (Tr. 156.) As to Foth's travel, the ALJ failed to consider Foth's testimony and the record evidence regarding its effect on her symptoms. To begin, Foth traveled to Germany and Oklahoma for a wedding and a funeral, respectively—two events one would likely make every effort to attend despite one's physical and mental ailments. (Tr. 212.) Furthermore, Foth testified that the flight to Germany was "horrendous" on her body, that she had to take extra pain and anxiety medications, and that

9

she traveled in a wheelchair throughout the airport. (*Id.*) She testified that she missed four hours of the wedding, needing to sleep. (*Id.*) After the drive to Oklahoma, Foth stated that it took her three days to recover. (Tr. 212.) Foth's testimony is reflected in contemporaneous notes to her therapist that her pain worsened after her Oklahoma trip. (Tr. 1301.) Thus, the ALJ did not consider the full picture of Foth's travel when relying on it to dismiss her allegations of disabling pain.

Similarly, though the ALJ relies on the fact that Foth was able to apply to, and was accepted by, Johns Hopkins University for a master's program to discount her alleged disabling symptoms (Tr. 156, 160), the ALJ ignores the fact that Foth ultimately dropped out of the program (Tr. 1313), testifying that she could not keep up with the work (Tr. 213). Foth then attempted to enroll in Southern New Hampshire University, but had to drop out of that program as well for the same reasons. (Tr. 214.) Thus, it is unclear how Foth's ability to complete the application process, when she was unable to complete the actual program, indicates that her symptoms are not as severe as alleged. For these reasons, the case must be remanded for the ALJ to properly consider all of the evidence regarding Foth's allegedly disabling symptoms.

Foth also generally argues that the ALJ failed to consider and assess her statements regarding her limitations, "vis-à-vis the record," such as: her legs burned; she had difficulty wearing clothes; she experienced fibro fog, pins-and-needles in her right arm, and difficulty using her hands; she had two to three panic attacks per week; she used a cane at times to ambulate; she reported fatigue and difficulty sleeping; and she had symptoms of IBS. (Pl.'s Br. at 14–15.) In other words, Foth argues that the ALJ failed to cite almost every conceivable alleged symptom she experienced. The ALJ need not specifically address every piece of

10

evidence in the record. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). However, as this case is being remanded anyway, the ALJ will be instructed to reconsider Foth's subjective symptoms.

        2.3       Consideration of Mental Impairments

Foth argues that the ALJ improperly assessed her mental impairments and improperly weighed all of the opinion evidence regarding her mental impairments. (Pl.'s Br. at 16–28.) Again, the ALJ found Foth had the severe mental impairments of anxiety and depression and limited her RFC as follows:

- limited to work where she can understand, remember, and carry out simple instructions and tasks;
- perform work that has no strict time or high quota demands;
- work in a routine setting that has only occasional changes in work routine;
- make simple workplace decisions;
- sustain concentration and persist at simple tasks up to 1 hour at a time with normal breaks during an 8-hour workday;
- incapable of interaction with the general public;
- capable of occasional, brief interaction with co-workers and supervisors;
- incapable of performing tandem tasks or working in a team environment;
- off-task up to 10% of the workday in addition to regularly scheduled breaks.

(Tr. 156.) Foth underwent a mental status evaluation with Dr. Sandra King on June 14, 2017. (Tr. 1266.) Dr. King found that Foth had moderate impairment in memory and concentration. (Tr. 1268.) She opined that Foth could understand directions, but would likely have mild to moderate difficulties remembering and carrying out instructions; would have mild difficulties responding appropriately to supervisors and co-workers; would be moderately impaired in her ability to maintain concentration and attention; and would have moderate to severe difficulties withstanding routine work stress and adapt to change. (*Id.*) The ALJ assigned partial weight to Dr. King's opinion, finding that Foth's physicians generally

noted that her memory was normal and Dr. King noted that Foth was able to do serial threes from 100 without error and could spell "world" forwards and backwards. (Tr. 158–59.)

Foth's treating therapist, Holly Doughty, LPC, completed a mental work capacity questionnaire on April 12, 2017, in which she opined that Foth's pain and other symptoms would often interfere with her attention and concentration; that she was capable of low stress jobs; that she had moderate difficulties in maintaining concentration, persistence, or pace; and that she would have one episode of decompensation, lasting at least two weeks. (Tr. 1261–62.) The ALJ assigned little weight to this opinion, finding that Doughty failed to define "low stress jobs" and that there was no evidence to support her conclusion that Foth would have one episode of decompensation in 12 months. (Tr. 159.)

At the initial level, State Agency psychologist Dr. Esther Lefevre opined that Foth had moderate limitations in maintaining concentration, persistence, or pace (Tr. 271); specifically, she was moderately limited in the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to respond appropriately to changes in the work setting (Tr. 274–76). At the reconsideration level, Dr. John Warren opined that Foth was moderately limited in the areas of understanding, remembering, and applying information and the ability to concentrate, persist, or maintain pace. (Tr. 319.) Dr. Warren further opined Foth was moderately limited in the ability to understand and remember detailed instructions; carry out detailed instructions; maintain concentration and attention for extended periods; and respond appropriately to changes in the work setting. (Tr. 323–24.) The ALJ assigned partial weight to the State Agency psychologists' opinions, finding that their opinions regarding Foth's ability to perform simple

12

tasks was consistent with the record; however, finding Foth had additional limitations due to her anxiety and panic attacks. (Tr. 159–160.)

Foth argues that if the ALJ wholesale adopted either Dr. King's or Doughty's opinions, it would have significantly reduced the occupational base. (Pl.'s Br. at 19.) Foth offers no explanation as to how the ALJ erred in assessing Doughty's opinion, and offers little explanation as to how, exactly, the ALJ erred in his assessment of Dr. King's opinion, beyond arguing in her reply that Dr. King noted moderate to severe impairment in adapting to change. (Pl.'s Br. at 12.) While the ALJ does rely on the earlier discussed suspect rationale that Foth was able to complete the application process for her master's degree program in assigning Dr. King's opinion partial weight, the ALJ otherwise accepts Dr. King's opinion regarding adaptation limitations and dealing with work stress, limiting Foth to work with no strict time or high quota demands, only occasional changes in work routine, and only simple workplace decisions. (Tr. 156.) Thus, I do not find the ALJ erred in his assessment of either Dr. King's or Doughty's opinions.

Foth's argument regarding how the ALJ addressed the opinions of the State Agency psychologists is confusing at best. She argues that the opinions are flawed, and the ALJ should not have assigned more weight to their opinions than to Dr. King's. (Pl.'s Br. at 23.) She also argues that the ALJ did not adequately address how he converted the State Agency findings into Foth's RFC. (*Id.* at 21, 23.) Under the law of this circuit, the ALJ must include in the RFC, and in the corresponding hypothetical question to the VE, all of the limitations the ALJ finds in the paragraph B criteria at steps 2 and 3 of the sequential evaluation, as well as those in the "summary conclusions" or "worksheet" section of the MRFCA form. *Hoeppner v. Berryhill*, 399 F. Supp. 3d 771, 778 (E.D. Wis. 2019). Again, Dr. Lefevre and Dr. Warren

13

found moderate limitations in these areas of concentration, persistence, or pace and adaptation: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to respond appropriately to changes in the work setting. (Tr. 274–76, 323–24.) In her narrative section, Dr. Lefevre stated that Foth "might have" moderate limitations in maintaining work pace due to her mental health impairments, but did not limit Foth in the "worksheet" section of the form. (Tr. 275.) The ALJ credited these opinions and limited Foth to work where she can understand, remember, and carry out simple instructions and tasks; perform simple workplace decisions; sustain concentration and persist at simple tasks; and work in a routine setting that has only occasional changes in work routine. It is entirely unclear how Foth's RFC fails to account for the limitations the State Agency psychologists found, or improperly credits these opinions over Dr. King's, to which the ALJ partially credited and assigned limitations appropriately. Thus, the ALJ did not err in his consideration of Foth's mental impairments.

### 2.4 Vocational Expert's Testimony Regarding Job Numbers

Finally, Foth argues that the method used by the VE to arrive at her jobs estimates lacks foundation under *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018) and thus the ALJ could not rely on the testimony to meet the Commissioner's burden of proof at Step Five. (Pl.'s Br. at 27–29.) Although this case is being remanded on other grounds, I will briefly address the issue.

At Step Five, an ALJ carries the burden in demonstrating with substantial evidence that jobs exist in significant number suitable for someone with the claimant's residual functional capacity. *Chavez*, 895 F.3d at 964. "In the context of job-number estimates, . . . the

14

substantial evidence standard requires the ALJ to ensure the approximation is the product of a reliable method." *Id.* at 968 (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). "Before accepting a VE's job number estimate, the ALJ, when confronted by a claimant's challenge, must require the VE to offer a reasoned and principled explanation." *Id.* at 970. This is not a formalistic exercise but a pragmatic requirement designed to ensure the reliability of the job numbers; the ALJ is not required to extensively question a VE if there are "sufficient indicia of reliability" as to the VE's testimony to support a conclusion about the applicant's ability to work. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

At the hearing, Foth's counsel questioned the VE regarding the source of her job numbers data. (Tr. 231.) The VE testified that she used a variety of government resources, including SOC codes, O*NET Census information, and data from SkillTRAN occupational employment surveys. (*Id.*) The VE testified that she estimates job numbers by taking the total number of jobs for a particular SOC code found in the SkillTRAN, verifies it through the O*Net, multiplies the percentage of jobs from the OES group that have the same SVP and physical demand levels, and then "time[s] that number, persons employed in that job, and I get an estimated number of jobs in the national economy." (Tr. 231–32.) Counsel objected to the job numbers pursuant to *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018), arguing that the VE's method of determining job numbers was unreliable. (Tr. 232.) The ALJ noted counsel's objection, and stated that if counsel wished to further specify his objections in a post-hearing brief, the ALJ would take the objection under advisement and address it in the decision. (*Id.*) In the decision, the ALJ noted that counsel failed to file a post-hearing brief in support of his objection; however, the ALJ found that the VE's methodology was reliable. (Tr. 163.)

The crux of Foth's argument is that the VE's testimony was not based on reliable evidence because the *Chavez* court found the use of such software as SkillTRAN and Job Browser Pro were unreliable. (Pl.'s Br. at 28.) That is not exactly correct. The Seventh Circuit has not spoken directly on the reliability of the SkillTRAN software, and courts in this circuit have upheld the VE's use of SkillTRAN and the ALJ's reliance on the numbers produced by SkillTRAN when the VE explains the methodology behind SkillTRAN. *See Djuric v. Berryhill*, No. 17-CV-832, 2018 WL 4705845, at *4 (E.D. Wis. Sept. 28, 2018) (collecting cases); *see also Westendorf v. Saul*, No. 19-CV-1019-JDP, 2020 WL 4381991, at *4 (W.D. Wis. July 31, 2020) ("[T]he Seventh Circuit has yet to opine on the reliability of Job Browser Pro's software.").

Furthermore, the Seventh Circuit recently stated in *Brace v. Saul*, 970 F.3d 818 (7th Cir. 2020) that the Supreme Court's decision in *Biestek* "explained that a vocational expert's job-number testimony will survive review under the substantial-evidence standard as long as it rests on a well-accepted methodology and the expert describes the methodology 'cogently and thoroughly.'" *Id.* at 822 (quoting *Biestek*, 139 S. Ct. at 1155). The *Brace* court did not, as Foth suggests, determine that use of SkillTRAN or Job Browser Pro software is automatically unreliable. (*See* Pl.'s Reply Br. at 14–15.) The issue with the vocational expert's testimony in *Brace* was that it was "entirely unilluminating," using "unelaborated words and phrases such as 'weighting' and 'allocation' and 'my information that I have." *Id.* at 822. The *Brace* court noted that while the "equal distribution method" of job estimates is often criticized, it *does* have a defined meaning. *Id.* at 823. In contrast, the VE's methodology in *Brace* was "unintelligible"—no one knows what the VE meant by words like "weighting." *Id.* Again, a VE's job numbers testimony will be supported by substantial evidence if it rests on a well-accepted methodology and the expert describes it thoroughly. *Id.* at 822. Because Foth

16

declined to file a post-hearing brief, the entirety of her argument was a non-specific objection as to reliability. (Tr. 232.) Foth then argues the ALJ never determined whether the VE's methodology was reliable. (Pl.'s Br. at 28.) This is simply incorrect. (*See* Tr. 163.) The VE's testimony is not automatically unreliable simply because the VE used the SkillTRAN software. The VE explained her methodology and the ALJ addressed Foth's objection and determined the VE's testimony was reliable. Thus, the ALJ did not err in this regard.

## CONCLUSION

Foth argues that the ALJ made a multitude of errors in determining she was not disabled. Because I find the ALJ erred in his consideration of Foth's subjective symptoms, the Commissioner's decision is reversed and the case will be remanded for further proceedings consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of February, 2021.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge